UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

HERIBERTO TORIBIO-RUIZ,

                              Petitioner,

        v.

TIM GARRETT,[1] *et al.*,

                              Respondents.

Case No. 3:14-cv-00492-MMD-CSD

ORDER

## I.    SUMMARY

Petitioner Heriberto Toribio-Ruiz, who is serving 30 years to life after a jury found him guilty of sexual assault on a child and lewdness with a child, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (*See* ECF Nos. 19-15, 31.) This matter is before the Court for adjudication of the merits of the remaining[2] grounds in Toribio-Ruiz's second amended petition (ECF No. 31 ("Petition")), which allege that he was interrogated without first being informed of his rights pursuant to *Miranda*,[3] the state district court improperly prevented him from presenting expert testimony, the prosecutor committed misconduct, and his counsel was ineffective at sentencing. As explained further below, the Court denies the Petition and also denies a Certificate of Appealability.

///

///

///

_____

[1]The state corrections department's inmate locator page states that Toribio-Ruiz is incarcerated at Lovelock Correctional Center. Tim Garrett is the current warden for that facility. At the end of this order, this Court directs the clerk to substitute Tim Garrett as a respondent for the prior respondent Isidro Baca. *See* Fed. R. Civ. P. 25(d).

[2]This Court previously dismissed grounds 4(b), 4(c), 4(d), 4(e), 5, and 6. (ECF No. 82.)

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

## II.     BACKGROUND[4]

Shandra Moody, the mother of L.M., B.S., and E.S.,[5] testified that "usually every other weekend" the three girls would spend the night at the apartment of Jovita Castaneda, their grandmother, who was dating Toribio-Ruiz. (ECF No. 17-2 at 24-25, 27.) On December 30, 2003, L.M. and B.S. told Moody that, during those overnight visits, Toribio-Ruiz "puts his hand in" their pants while they sleep. (*Id.* at 27-30.)

L.M. testified that, at the time of the trial in 2005, she was eight years old, B.S. was seven years old, and E.S. was five years old. (*Id.* at 43, 55-56.) When the girls spent the night at Castaneda's apartment, L.M. testified that they slept in the living room with Castaneda and Toribio-Ruiz. (*Id.* at 56.) L.M. testified that Toribio-Ruiz touched her "[o]n the private" with his hand and "made small circular motions." (*Id.* at 59-61.) L.M. testified that it looked like Toribio-Ruiz was sleeping and that she told him to stop. (*Id.* at 61, 78.) B.S. testified that Toribio-Ruiz, on more than one occasion, touched the inside of her "private" with his finger and "moved it around" while she was sleeping. (*Id.* at 81, 95-97, 99.) B.S. told detectives that Toribio-Ruiz was asleep when these incidents occurred. (*Id.* at 110.) Castaneda testified that she never saw Toribio-Ruiz touch L.M. or B.S. (ECF No. 17-4 at 7, 12.)

Detective Curtis Lampert of the Reno Police Department interviewed Toribio-Ruiz, and claims Toribio-Ruiz "eventually talked about confessing his crimes to a priest and that he didn't know how it happened or why it happened." (ECF Nos. 17-3 at 114; 17-2 at 33.) Toribio-Ruiz then "became emotional and started crying and telling [Detective

---

[4]This Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. This Court's summary is merely a backdrop to its consideration of the issues presented in the case. Any absence of mention of a specific piece of evidence does not signify this Court overlooked it in considering Toribio-Ruiz's claims.

[5]The Local Rules of Practice state that "[p]arties must refrain from including—or must partially redact, where inclusion is necessary—[certain] personal-data identifiers from all documents filed with the court." LR IC 6-1(a). This includes the names of minor children. LR IC 6-1(a)(2). As such, this Court only refers to children by their initials.

1    Lampert] that he felt bad and that he wanted to apologize to the family." (ECF No. 17-3
2    at 33.)

3           Toribio-Ruiz testified and denied touching L.M. or B.S. inappropriately; rather, he
4    testified that he woke up once and his hand was on L.M.'s stomach, on top of her clothes,
5    and woke up another time and his hand was on B.S.'s stomach, on top of her clothes.
6    (ECF No. 17-6 at 14, 36-37.) Toribio-Ruiz testified that he discussed these incidents with
7    a priest (*Id.* at 54.) Toribio-Ruiz also testified that his confession to Detective Lampert
8    was false (ECF No. 18-3 at 51), explaining that "the pressure that [he] was under and
9    how [he] was feeling at the moment, [he did not] know what it was that [he] answered or
10   how was it, because when [he] saw the video, [he] saw things that they surprised [him]
11   very much." (ECF No. 18-3 at 39.)

12          Dr. Deborah Davis, a psychologist specializing in false confessions, testified, *inter*
13   *alia*, that Detective Lampert used many interrogations tactics that, when assessed in
14   conjunction with Toribio-Ruiz's actions and statements, indicated that Toribio-Ruiz's
15   confession was "possibly false":

16          [T]hroughout the interrogation the detective was referring to evidence
17          against [Toribio-Ruiz]. Most of it was the testimony of the girls. He kept
             reminding [Toribio-Ruiz] of it, and also he mentioned other people he had
18          talked to.

19                 And he had a long segment about DNA and how that can stay on
             their skin for long periods of time after the last time you touched them and
20          so on.

21                 And also he continually let [Toribio-Ruiz] know that he didn't believe
             there was any chance he didn't do it: that he firmly believed this did happen
22          and the only question was only exactly what did happen. And throughout, if
             [Toribio-Ruiz] tried to deny that he remembered or anything else, he would
23          say, well, that can't be true because, or we know that's not true, et cetera.

24                 So the creating and reinforcing the sense of futility and the sense of
             evidence against you was clearly there.

25                 Also the theme development was throughout. It started out with the:
26          You were asleep and didn't know what you were doing theme and then it
             progressed to: Well, you really weren't asleep, but it still was just a mistake;
27          you were still thinking about something else and you didn't really realize it
             was them that you were touching. Those kinds of things. And those were
28          throughout.

3

1

2

> And certainly sympathy and flattery: I want to help you, creating the sense that the detective's goal was to help [Toribio-Ruiz], rather than to put him in prison and so on.

(ECF No. 18-4 at 86-87.)

### III.   LEGAL STANDARD

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

4

1    The Supreme Court has instructed that "[a] state court's determination that a

2    claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

3    disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562

4    U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The

5    Supreme Court has stated "that even a strong case for relief does not mean the state

6    court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at

7    75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as

8    a "difficult to meet" and "highly deferential standard for evaluating state-court rulings,

9    which demands that state-court decisions be given the benefit of the doubt" (internal

10   quotation marks and citations omitted)).

11   **IV.    DISCUSSION**

12   **A.    Ground 1—Self-Incrimination**

13   In ground 1, Toribio-Ruiz alleges that he was deprived of his rights to be free from

14   self-incrimination and to counsel under the Fifth, Sixth, and Fourteenth Amendments

15   because he was interrogated without first being informed of his rights pursuant to

16   *Miranda*. (ECF No. 31 at 16.)

17   **1.    Background**

18   Toribio-Ruiz filed a pre-trial motion to suppress his statements to law

19   enforcement. (ECF No. 14-13.) At a pre-trial hearing held on Toribio-Ruiz's motion,

20   Detective Lampert testified that he contacted Toribio-Ruiz at his apartment to speak with

21   him about "allegations of some misconduct on his behalf." (ECF No. 15-8 at 38, 40-41.)

22   Toribio-Ruiz answered the door and invited Detective Lampert and his partner inside.

23   (*Id.* at 41.) Detective Lampert told Toribio-Ruiz the purpose of the contact and asked

24   him to come to the station, which was an office within a county government building. (*Id.*

25   at 41-42.) Detective Lampert testified that he "believe[d]" he asked Toribio-Ruiz whether

26

27

28

1   he needed the assistance of an interpreter and that Toribio-Ruiz indicated that he did

2   not.[6] (*Id.* at 42.) Toribio-Ruiz drove his own vehicle to the interview location. (*Id.* at 58.)

3       At the beginning of the interview, which was held in a "fairly small" unlocked room

4   with no windows, Detective Lampert told Toribio-Ruiz that "he was not under arrest, he

5   was free to leave and he did not have to speak with" him. (*Id.* at 43, 49, 66.) Detective

6   Lampert also "share[d] with [Toribio-Ruiz] the location of the bathrooms, . . . where the

7   water fountain [was], . . . [and] offer[ed] him refreshments." (*Id.* at 44.) Detective Lampert

8   did not read Toribio-Ruiz his *Miranda* rights prior to the interview "[b]ecause it was a

9   consensual interview" at that point. (*Id.* at 58.)

10      Detective Lampert interviewed Toribio-Ruiz for "around an hour and a half." (*Id.*

11  at 46.) Detective Lampert testified that he lied to Toribio-Ruiz several times during the

12  interview, including telling Toribio-Ruiz (1) "some things about DNA" even though he did

13  not "have any reason to believe [he] had DNA evidence," (2) the girls were undergoing

14  a CARES exam, which was untrue, and (3) Castaneda had been interviewed, which was

15  untrue. (*Id.* at 53, 54, 62.) Detective Lampert also testified that, during the interview, he

16  did most of the talking, spoke over Toribio-Ruiz at times, and spoke quickly even

17  though—knowing Toribio-Ruiz's primary language was not English—Toribio-Ruiz asked

18  him to slow down. (*Id.* at 55, 62-63, 69-70, 72.) However, Detective Lampert testified

19  that Toribio-Ruiz "appear[ed] to understand English sufficiently well to answer [his]

20  questions," never asked for an interpreter, and only "seem[ed] confused a bit" when they

21  were discussing vaginal penetration. (*Id.* at 60-61, 64.) "[P]erhaps an hour or more into

22  the interview," following Toribio-Ruiz's confession, Detective Lampert decided to arrest

23  Toribio-Ruiz and read him his *Miranda* rights. (*Id.* at 55, 58, 72.)

24      The state district court denied the suppression motion. (ECF No. 16-7.)

25              **2.      Custodial Interrogation Standard**

26

27          [6]The preliminary hearing transcript indicated that Detective Lampert testified that
28  Toribio-Ruiz *did* want an interpreter for his interview, but Detective Lampert testified at
    the pre-trial motions hearing that he believed the preliminary hearing transcript was
    incorrect. (ECF No. 15-8 at 43.)

1
2
3
4
5
6
7
8
9
10

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Custodial interrogation "mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

"[T]he ultimate inquiry" of whether someone is in custody "is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); *see also Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (holding that "persons temporarily detained pursuant to [ordinary traffic] stops are not 'in custody' for the purposes of *Miranda*"). There are "[t]wo discrete inquiries" to determine whether an individual is in custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Relevant factors in ascertaining how an individual would assess his freedom of movement "include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted). The "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

28

### 3.    State court determination

1    In affirming Toribio-Ruiz's judgment of conviction, the Nevada Supreme Court

2  held:

3       Ruiz contends that his confession should have been suppressed because
        it was taken in violation of his *Miranda* rights. Ruiz claims that he was
4       subjected to a custodial interview. Ruiz also contends that Detective
        Lampert used deception and coercion to obtain Ruiz's confession and that
5       the place of interrogation was police-dominated. Ruiz contends that
        Detective Curtis Lampert failed to offer him an interpreter before Ruiz made
6       his inculpatory statements.

7            This court will not disturb the district court's determination of a
        defendant's custody status if the determination is supported by substantial
8       evidence.

9            [FN2] *Alward v. State*, 112 Nev. 141, 154, 912 P.2d 243, 252
        (1996).
10
             The district court found for purposes of *Miranda*, that Ruiz was not in
11      custody and that his confession was given in a knowing, voluntary and
        intelligent manner.
12
             [FN3] 384 U.S. 436.
13
        The district court also found that Ruiz drove his own vehicle to the interview
14      which was held in a building open to the public, and that Ruiz had a high
        degree of mastery of the English language. The district court also found that
15      Detective Lampert did not use improper deception or otherwise coerce Ruiz
        into relinquishing his rights. Therefore, we conclude that the district court
16      did not err in finding that Ruiz was not in custody for the purpose of *Miranda*.
        Accordingly, the district court correctly admitted Ruiz's confession.
17

18  (ECF No. 20-6 at 2-3.)

19                    **4.      Analysis**

20    As the Nevada Supreme Court reasonably noted, Toribio-Ruiz drove his own

21  vehicle to the interview, the interview was held in a county government building open to

22  the public, and Toribio-Ruiz understood English sufficiently well to partake in the

23  interview. And, importantly, Detective Lampert testified—and the videotape of Toribio-

24  Ruiz's law enforcement interview confirmed (*see* ECF No. 33)—he told Toribio-Ruiz,

25  who was not physically restrained, at the beginning of the interview, which lasted only

26  roughly over an hour prior to the giving of *Miranda* warnings, that he was free to leave

27  and did not have to speak with him. And though Detective Lampert lied to Toribio-Ruiz

28  about the evidence he had obtained against him, Detective Lampert's false statements

                                    8

1    alone do not support a determination that Toribio-Ruiz was in custody for purposes of

2    *Miranda. See Oregon v. Mathiason*, 429 U.S. 492, 495-96 (1977) ("The officer's false

3    statement about having discovered Mathiason's fingerprints at the scene . . . has nothing

4    to do with whether respondent was in custody for purposes of the *Miranda* rule."); *see*

5    *also Bains v. Cambra*, 204 F.3d 964, 973 (9th Cir. 2000) ("Although Bains was

6    questioned by several police officers, who in fact had lied to him about . . . incriminating

7    statements [made] about him, such admittedly targeted questioning solely by virtue of

8    occurring at a police station does not constitute a custodial interrogation sufficient to

9    trigger the requirements of *Miranda*."). Given these objective circumstances surrounding

10   the interview, a reasonable person would have felt that he or she was at liberty to leave

11   the interview. *See Thompson*, 516 U.S. at 112; *Howes*, 565 U.S. at 509; *Stansbury*, 511

12   U.S. at 323. Accordingly, the Nevada Supreme Court's determination that the state

13   district court did not err in determining that Toribio-Ruiz was not in custody before being

14   given *Miranda* warnings was neither contrary to, nor an unreasonable application of,

15   clearly established federal law and was not based on an unreasonable determination of

16   the facts. Toribio-Ruiz is not entitled to federal habeas relief for ground 1.

17                          **B.    Ground 2—Limitation of Defense Expert Testimony**

18          In ground 2, Toribio-Ruiz alleges that he was deprived of his right to due process,

19   a fair trial, and compulsory process of witnesses under the Fifth, Sixth, and Fourteenth

20   Amendments because the state district court refused to allow him to present expert

21   testimony about false memories and specific examples of false confessions. (ECF No.

22   31 at 21.)

23                          **1.    Background**

24          Following Toribio-Ruiz's filing of an expert witness notice for Dr. Deborah Davis,

25   the State filed a pre-trial motion in limine regarding the "admissibility of certain testimony

26   to be offered by Deborah Davis." (ECF No. 16-17.) At a hearing held on the State's

27   motion, regarding false memories, Dr. Davis testified, *inter alia*, that (1) it is possible to

28   create a false memory in a child, which can "happen[ ] because somebody has made a

                                                    9

suggestion," (2) younger children are more susceptible to created memories than adults, (3) parents "are completely untrained in how to avoid bias in any way in talking to their children," including refraining from using leading questions, (4) the use of repeated questions "makes reports less accurate," and (5) L.M. and B.S., who were initially questioned by their mother, spoke about the abuse "very easily and very smoothly" during their police interview, which "inflate[s] confidence" in their story and indicates that they had repeated their story many times. (ECF No. 16-18 at 12-14, 18-20, 22-23.) And regarding false confessions, Dr. Davis testified, *inter alia*, (1) there is "lots of evidence that people do falsely confess," (2) "interrogation procedures are deliberately designed to convince the person that it's in their best interest to confess" whether they are guilty or not, (3) the Reid Nine-Step Method, which is "the most commonly used training book" for police officers on how to do interrogations, is effective in getting a confession "[w]hether you did it or you didn't do it," and (4) under the circumstances of Toribio-Ruiz's interrogation, where "a person has been subjected to so many basically coercive techniques and rewards and punishments that are implied and stated," the confession is not "good evidence of whether they did it or not." (*Id.* at 46, 50, 52, 60, 77.)

The state district court denied the "request to have [Dr. Davis] testify on the child credibility issue unless and until there's an issue raised at the trial" because "it is not relevant and it would lead to confusion on the part of jurors and does not aid the jurors in reaching a determination in this case." (ECF No. 21-30 at 48.) And regarding the false confession testimony, the state district court held:

> I'm going to allow her to testify as to the Reid Nine-Stop Method. If there are specific instances that she wants to bring in of how the Reid Nine-Step Method has resulted in a false confession, then that may well be admissible. I would be concerned if it was a piece of the nine-step method that wasn't utilized in this case or that isn't relevant with regard to Mr. Toribio, but I'm not going to allow her just to talk in terms of the Innocence Project and false confessions in general.
>
> That isn't the point of her testimony. The point of her testimony is that in this particular instance a method was used that can elicit false confessions, and that is the Reid Nine-Step Method. And she can talk about it, she can describe it. She doesn't need to go into the jogger case to have relevance to the jury. And I base that on the fact that as I listen to her and look at the video, it was relevant. Without any consideration of whether or

1

2

not the jogger case resulted in a false confession, it isn't necessary to hear testimony to evaluate the Reid Nine-Step and start looking at it in terms of whether or not it elicits a false confession.

So I don't think - - I think bringing in extraneous information about other confessions that were taken that were later determined to be false that have no relationship to the Reid Nine-Step Method would be prejudicial to the State and they wouldn't be able to respond. All of a sudden we'd be trying all sorts of sub cases in this about whether or not that was a false confession, why it was a false confession, how it's related to this case, how it doesn't relate to this case. What relates to this case is the Reid Nine-Step Method that was utilized by the police officers.

3

4

5

6

7

(*Id.* at 48-49.)

8

### 2.    Presentation of Defense Theory Standard

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) (explaining that an accused "has the right to present his own witnesses to establish a defense" and that "[t]his right is a fundamental element of due process of law"); *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) ("The Supreme Court has made clear that the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense."). "[T]he Constitution [also] guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). A defendant's opportunity to be heard "would be an empty one if the State were permitted to exclude competent, reliable evidence . . . when such evidence is central to the defendant's claim of innocence." *Id.* This is because, "[i]n the absence of any valid state justification, exclusion of . . . exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" *Id.* at 690-91 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

27

28

That being said, the United States Supreme Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that

themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Crane*, 476 U.S. at 690; *see also United States v. Scheffer*, 523 U.S. 303, 308 (1998) ("A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions.") In fact, the Supreme Court has indicated its approval of "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006). And evidentiary rules do not violate a defendant's constitutional rights unless they "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 324 (alteration in original) (internal quotation marks omitted); *see also Scheffer*, 523 U.S. at 315 (explaining that the exclusion of evidence pursuant to a state evidentiary rule is unconstitutional only where it "significantly undermined fundamental elements of the accused's defense"). "In general, it has taken 'unusually compelling circumstances . . . to outweigh the strong state interest in administration of its trials.'" *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009) (internal quotation marks omitted).

### 3.   State Court Determination

In affirming Toribio-Ruiz's judgment of conviction, the Nevada Supreme Court held:

> Ruiz contends that the district court erred in preventing him from presenting his complete theory of defense. Ruiz contends that the district court should have allowed Dr. Deborah Davis to testify about how false memories can be created in a "victim." Ruiz contends that Dr. Davis should have been allowed to provide specific examples proving that false confessions do actually occur.
>
> We will not disturb a district court's decision to admit or exclude evidence unless it is manifestly erroneous.
>
> [FN4] *Lucas v. State*, 96 Nev. 428, 431-32, 610 P.2d 727, 730 (1980).
>
> The district court correctly allowed Dr. Davis to testify that she saw indicia of a false confession in Ruiz's confession. The district court also would not allow Dr. Davis to testify on the false memory issue "unless and until there

1

is an issue raised at the trial." Trial courts have considerable discretion in determining the relevance and admissibility of evidence.

2

3

[FN5] *See Sterling v. State*, 108 Nev. 391, 395, 834 P.2d 400, 403 (1992).

4

We conclude that the district court did not err in excluding the testimony.

5

(ECF No. 20-6 at 3–4.)

6

### 4.      Analysis

7

Allowing Dr. Davis to testify about false memories and specific examples of false

8

confessions would have been helpful defense evidence. However, as discussed, the

9

state district court determined that Dr. Davis' false memory testimony was not relevant,

10

would lead to confusion, and would not aid the jury. And regarding Dr. Davis' false

11

confession testimony, the state district court determined that allowing her to testify about

12

specific examples of false confessions would be unfairly prejudicial to the State. The

13

state district court's ruling limiting Dr. Davis' testimony constituted a valid state

14

justification for exclusion of Toribio-Ruiz's proposed defense evidence. *See Crane*, 476

15

U.S. 690-91. And Toribio-Ruiz fails to demonstrate that these evidentiary rules were

16

arbitrary or disproportionate to their purpose. *See Holmes*, 547 U.S. at 324. Accordingly,

17

the Nevada Supreme Court's determination that the state district court did not err in

18

limiting Dr. Davis' testimony was neither contrary to, nor an unreasonable application of,

19

clearly established federal law and was not based on an unreasonable determination of

20

the facts. Toribio-Ruiz is not entitled to federal habeas relief for ground 2.

21

### C.      Ground 3—Prosecutorial Misconduct

22

In ground 3, Toribio-Ruiz alleges that he was deprived of his right to due process

23

and a fair trial under the Fifth and Fourteenth Amendments based on the prosecutorial

24

misconduct that occurred when the prosecutor elicited testimony about an incriminating

25

statement without first disclosing the statement and then made numerous improper

26

comments in closing. (ECF No. 31 at 23.)

27

///

28

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1.    Background

#### a.    Non-Disclosed Statement

During the trial, Castaneda testified that she told Toribio-Ruiz's counsel that she would testify on Toribio-Ruiz's behalf at his trial. (ECF No. 17-5 at 9.) However, a few months before the trial was set to begin, Castaneda "changed her mind about that." (*Id.*) Castaneda met counsel for the first time the night before her trial testimony, but she did not want to speak with counsel because of a headache (*Id.* at 9-10.) Castaneda again refused to speak with counsel the following morning. (*Id.* at 10.) Importantly, during cross-examination, Castaneda testified that her son, Juan Sanchez, called her apartment around January 2004 and asked to speak to Toribio-Ruiz. (*Id.* at 22.) The prosecutor then asked, "[a]nd do you hear any portion of that conversation?" (*Id.* at 23.) Castaneda replied, "I only heard that he said, 'Forgive me,' but I don't know anything." (*Id.*)

Counsel objected, indicating that she was "learning about [this statement by Toribio-Ruiz to Sanchez] for the very first time." (*Id.* at 23-24.) The state district court recessed the trial. (*Id.* at 24.) Counsel then stated, *inter alia*, that she had to conduct "an out-of-state process because [she] knew [Castaneda] was hostile," the prosecution "has the duty to inform [her] of the statements of [her] client," the prosecutor failed to fulfil that duty since he was aware of the statement from his discussion with Castaneda earlier that morning, and she was "ask[ing] for a mistrial based upon prosecutorial misconduct." (*Id.* at 25-26.) The prosecutor stated that it learned of the "forgive me" statement from Castaneda "in an oral 20-, 25-minute conversation th[at] morning," but he did not believe he had done anything wrong since Castaneda was a defense witness who had previously spoken with the defense. (*Id.* at 26-27.)

The state district court disagreed with the prosecutor's latter statement, stating that the prosecutor "knew that [counsel] had never talked to the witness" because counsel had "put on the record before she called [Castaneda] as a witness" that Castaneda would not speak with her. (*Id.* at 28–29.) The state district court then stated

14

1    it thought there was "a problem" because "why would [counsel] call [Castaneda] as a
2    witness if she knew she was going to say that her client made an admission that seemed
3    to appear that he was guilty? . . . She wouldn't. And [the prosecutor] had the information,
4    and [the prosecutor] didn't share it." (*Id.* at 29.) The state district court held the matter in
5    abeyance and scheduled an evidentiary hearing after the trial. (ECF No. 17-6 at 4.)

6          At the post-trial evidentiary hearing, Sanchez testified that he called Toribio-Ruiz
7    on January 16, 2004, at the request of Detective Lampert "to find out what had
8    happened." (ECF No. 19 at 12-14.) During that conversation, Toribio-Ruiz used "the
9    words forgive me or forgiveness." (*Id.* at 16.) Although Sanchez took notes during the
10   telephone call, he did not note the forgiveness comments in those notes. (*Id.* at 15-16.)
11   Sanchez also did not tell Detective Lampert about the forgiveness comment because
12   he "possibly . . . spaced it." (*Id.* at 17.) Castaneda testified at the hearing that she never
13   told Toribio-Ruiz's counsel about hearing Toribio-Ruiz say "forgive me" while speaking
14   on the telephone with Sanchez. (*Id.* at 38, 64.)

15         The state district court denied the motion for a mistrial, "find[ing] that [the State's]
16   misconduct was harmless." (ECF No. 19-6 at 8.)

17                         **b.    Closing Argument**

18          During the State's closing argument, the prosecutor stated, "[i]n this case . . .
19   th[e] presumption of innocence that you had when you had no evidence in front of you,
20   that all went away." (ECF No. 18-7 at 13.) Toribio-Ruiz's counsel objected, and the state
21   district court overruled the objection, explaining, "I don't think it's argument—I know
22   where he's going. He's saying until the State proves the evidence, that's a jury
23   instruction." (*Id.*) The prosecutor then continued, "[u]ntil you heard the testimony of those
24   little girls, and the defendant's own words on the videotape. At that point in time, I'll
25   submit to you on behalf of the State, that presumption is gone." (*Id.*)

26          Later, after discussing Toribio-Ruiz's law enforcement interview, the prosecutor
27   stated:

28          There's a song, Shaggy. I have a daughter who is 13, and there's a song
            that Shaggy puts out where his girlfriend, I'll give you briefly what it starts

15

> with: His girlfriend catches him red-handed with another woman. And he
> goes to his friend and he says, "What do I do?" And his friend says, "Say it
> wasn't you."
>
> What do you do, when your defendant comes to you with a
> confession? "Say it isn't true." Think about that. What other defense is
> there? What other defense is there, when you've got that tape and his
> admissions and the things that he said happened?

(*Id.* at 24.) Counsel objected, a bench conference was held, and the objection was

sustained. (*Id.*)

Next, when discussing Toribio-Ruiz's sisters, daughter, and mother of his

children, who testified on his behalf at trial, the prosecutor stated:

> They came in and told you he's not the type of man that would do this. What
> do we know? Sisters love brothers. Children love fathers. Wives love the
> father of their children. And if you ask family members for Ted Bundy to
> come in and give you character evidence . . . you would have heard the
> same thing.

(*Id.* at 28.) Counsel objected, and the state district court told the State, "[L]et's keep this

closing argument to the facts of this case and not bring in any others. I don't think you

really wanted to bring that as having to do anything with our" case. (*Id.*)

Thereafter, when discussing Toribio-Ruiz's counsel's argument about the victims'

drawings, the prosecutor stated:

> Little girls, when they're drawing stick figures trying to draw a little diagram,
> aren't concerned about the facial features. It's like the hair. You have to
> have a long sloping hair to be a girl and a little top thing to be a guy.
>
> Well, [Toribio-Ruiz] has no hair at all. Look at the photograph.
> There's hair on [Toribio-Ruiz] on his head. It means absolutely nothing.
> Don't let the smoke and mirrors get to you, ladies and gentlemen.

(*Id.* at 32-33.) Counsel "[o]bject[ed] to the characterization of the defense of smoke and

mirrors." (*Id.* at 33.) The state district court responded, "Counsel, go ahead and finish

up your argument." (*Id.*)

Finally, at the end of his argument, the prosecutor stated:

> This is a truth-finding process. And ladies and gentlemen, there's only one
> version of the truth. There's going to be multiple versions of untruths, but
> there's only one version of the truth. And you've heard from the girls. You've
> heard from [Toribio-Ruiz] during the interview, and I'll submit to you the truth
> is exactly that, that what he's charged with. That's what we proved, and I'm

asking you to hold him accountable, what he did was wrong to those little girls. He needs to be held accountable.

(*Id.* at 36–37.) Toribio-Ruiz's counsel objected, explaining that the prosecutor "should be addressing the comments to the jurors. It's improper for him to turn and point and address my client." (*Id.* and 37) The state district court overruled the objection, explaining that the prosecutor's actions were not improper. (*Id.*)

### 2.      Prosecutorial Misconduct Standard

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In making that determination, this Court looks to various factors: "the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in summation and whether defense counsel had an adequate opportunity to rebut the comment." *Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir. 2020) (quoting *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010)). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

### 3.      State Court Determination

In affirming Toribio-Ruiz's judgment of conviction, the Nevada Supreme Court held:

> Ruiz contends that the district court erred in denying his motion for a mistrial based upon prosecutorial misconduct. Ruiz alleges that the prosecutor engaged in misconduct by failing to inform the defense of an inculpatory statement purportedly made by Ruiz, and by eliciting that statement from a witness in front of the jury. Ruiz also argues that the prosecution compounded the prejudice against him when the prosecutor argued against the presumption of innocence by telling the jury that the defense was

"smoke and mirrors," and by comparing Ruiz's defense to the notorious criminal "Ted Bundy's defense."

[FN6] *Bundy v. State*, 471 So.2d 9 (Fla. 1985).

The district court sustained Ruiz's objections regarding defense tactics and the comparison to Ted Bundy. The district court also gave jury instructions designed to cure the prosecutorial misconduct.

"[E]ven deliberate misconduct by the prosecutor does not necessarily make the error reversible."

[FN7] *Middleton v. State*, 114 Nev. 1089, 1113, 968 P.2d 296, 312 (1998).

The district court concluded that the prosecutorial misconduct was harmless and did not impair the fairness of the trial in the face of the overwhelming evidence of Ruiz's guilt. "[W]here evidence of guilt is overwhelming, even aggravated prosecutorial misconduct may constitute harmless error."

[FN8] *King v. State*, 116 Nev. 349, 356, 998 P.2d 1172, 1176 (2000).

We have carefully considered all issues raised by Ruiz and conclude that given the district court's prophylactic measures to cure the prosecutorial misconduct and the overwhelming evidence of Ruiz's guilt, any residual effect of the prosecutorial misconduct did not rise to the level necessary to reverse Ruiz's conviction. We therefore conclude that the district court did not commit reversible error.

Finally, we admonish prosecutor Steven M. Barker for not disclosing the inculpatory statement, making disparaging remarks about defense tactics, and likening Ruiz to Ted Bundy. This court has previously warned that "such toying with the juror's imagination is risky and the responsibility of the prosecutor is to avoid the use of language that might deprive a defendant of a fair trial."

[FN9] *Jones v. State*, 113 Nev. 454, 469, 937 P.2d 55, 65 (1997) (quoting *Pacheco v. State*, 82 Nev. 172, 180, 414 P.2d 100, 104 (1966)).

Further misconduct of this nature by Barker could lead to a referral to the State Bar of Nevada.

(ECF No. 20-6 at 46.)

### 4.      Analysis

Addressing first Toribio-Ruiz's claim that the prosecutor elicited an incriminating statement without prior disclosure of the statement, the Supreme Court has indicated that a defendant's constitutional right to obtain evidence does not extend to evidence that is inculpatory. *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("It does not

18

follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably."). Indeed, "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one . . . . '[T]he Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded.'" *Id.* (quoting *Wardius v. Oregon*, 412 U.S. 470, 474 (1973)). Thus, a habeas petitioner claiming that the prosecution failed to disclose inculpatory evidence must show that the petitioner "was prejudiced by the State's conduct in a way that rendered his trial fundamentally unfair." *Coleman v. Calderon*, 210 F.3d 1047, 1052 (9th Cir. 2000). Although Toribio-Ruiz did not learn of the "forgive me" statement until Castaneda's cross-examination, Toribio-Ruiz fails to demonstrate that the State's failure to disclose this inculpatory evidence rendered his trial fundamentally unfair because, as the Nevada Supreme Court reasonably determined, there was overwhelming evidence of Toribio-Ruiz's guilt, including his confession to law enforcement, the victims' testimonies, and his testimony at trial that he discussed the incidents with a priest prior to his confession.

Turning next to Toribio-Ruiz's claims of prosecutorial misconduct during closing argument, Toribio-Ruiz challenges the prosecutor's comment on the presumption of innocence, the prosecutor disparaging the defense by comparing the defense argument to a song and describing it as "smoke and mirrors," the prosecutor using inflammatory rhetoric when he compared him to Ted Bundy, and the prosecutor inserting his personal beliefs into the case when he pointed his finger at him and asked the jury to hold him accountable. As the Nevada Supreme Court reasonably determined, the prosecutor committed misconduct with several of these comments. *See, e.g.*, *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005) ("We have consistently cautioned against prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury."). However, Toribio-Ruiz fails to demonstrate that these comments "so infected [his] trial with unfairness as to make [his] resulting conviction a denial of due process" because the jury was accurately instructed on the presumption

1    of innocence,[7] the jury was instructed that the prosecutor's statements were not
2    evidence,[8] and there was overwhelming evidence of Toribio-Ruiz's guilt. *See Darden*,
3    477 U.S. at 181; *see also Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005) (finding
4    that prosecutorial misconduct did not amount to a due process violation where the trial
5    court gave an instruction that the attorneys' statements were not evidence and where
6    the prosecutors presented substantial evidence of the defendant's guilt).

7        Thus, the Nevada Supreme Court's denial of relief on Toribio-Ruiz's prosecutorial
8    misconduct claims was neither contrary to, nor an unreasonable application of, clearly
9    established federal law and was not based on an unreasonable determination of the
10   facts. Toribio-Ruiz is not entitled to federal habeas relief for ground 3.

11                **D.    Ground 4(a)—Ineffective Assistance of Counsel at Sentencing**

12       In ground 4(a), Toribio-Ruiz alleges that he was deprived of his right to the
13   effective assistance of counsel under the Sixth and Fourteenth Amendments because
14   counsel was ineffective at sentencing. (ECF No. 31 at 29.) Specifically, Toribio-Ruiz
15   alleges that counsel did not consult with him about sentencing, did not call any character
16   witnesses, made only a brief argument, failed to argue that his lewdness sentence
17   should be under an older version of the law, and presented nothing about his life,
18   characteristics, and whether he deserved the maximum sentence. (*Id.* at 31-32; ECF 86
19   at 37.)

20                **1.    Nevada's Lewdness Law**

21       Toribio-Ruiz was convicted of lewdness with a child under NRS § 201.230. (ECF
22   No. 50-6 at 2.) The State originally charged Toribio-Ruiz with lewdness with a child,
23   alleging that the offense happened sometime between January 1, 2003, and September
24   30, 2003. (ECF No. 42-6 at 3-4.) The State later amended the charge, alleging that the

25

26       [7]The jury was instructed that "[e]very person charged with the commission of a
     crime shall be presumed innocent unless the contrary is proved by competent evidence
27   beyond a reasonable doubt." (ECF No. 49-2 at 11.)

28       [8]The jury was instructed that "[n]othing that counsel say during the trial is evidence
     in the case." (ECF No. 49-2 at 7.)

1    offense happened sometime between January 1, 2003, and December 31, 2003. (ECF

2    No. 46-3 at 3.)

3          On October 1, 2003, the Nevada Legislature amended NRS §§ 201.230(2) and

4    176A.100(1)(a). Before the change in the law, a defendant could receive either probation

5    or 10 years to life for a lewdness with a child conviction, but after the change in the law,

6    a defendant could receive 2 to 20 years or 10 years to life. *See* 2003 Nev. Stat., ch. 461,

7    § 2, at 2826; 2003 Nev. Stat., ch. 461, § 3, at 2827.

8                            **2.       Background**

9          At Toribio-Ruiz's sentencing hearing, the state district court indicated that it had

10   received and considered "letters submitted on behalf of the defendant."[9] (ECF No. 19-8

11   at 4.) Toribio-Ruiz's counsel then argued, *inter alia*, that (1) Toribio-Ruiz's criminal

12   history only included two prior misdemeanors for domestic battery, and one of those

13   victims testified on his behalf at the trial; (2) Toribio-Ruiz's family and friends were

14   surprised by the allegations made against him and were convinced that he was innocent;

15   (3) Toribio-Ruiz maintained his innocence; and (4) the counts should be ordered to run

16   concurrently. (*Id.* at 7-10.) Counsel also noted that "there [were] three dozen people [in

17   the courtroom] on behalf of him . . . to show their support." (*Id.* at 7-8.) And after the

18   prosecutor made his sentencing argument, counsel argued again for concurrent

19   sentences, noting that Toribio-Ruiz's lewdness charge was less serious than other

20   lewdness charges because "factually what the child said is that he touched her on the

21   outside of his [sic] underwear, it happened, she scooted away and that was the end of

22   it." (*Id.* at 17.)

23         At a post-conviction evidentiary hearing, Toribio-Ruiz's counsel testified she

24   discussed "the different stages of the trial," including sentencing, during her

25   representation of Toribio-Ruiz so that he would know what to expect. (ECF No. 21-6 at

26   10.) And following the jury verdict and prior to sentencing, counsel met with Toribio-Ruiz

27   twice in person at the two post-trial hearings on the motion for a mistrial and spoke with

28   _____

[9]Toribio-Ruiz's counsel submitted six letters on his behalf. (*See* ECF No. 19-7.)

21

him on the telephone once. (*Id.* at 9, 13.) Counsel did not recall specifically discussing with Toribio-Ruiz the presentation of witnesses at sentencing, but she "must have had a conversation about letters on his behalf" since letters were submitted. (*Id.* at 10.) Counsel testified that she did not call witnesses at his sentencing because she had "put up a character defense during the course of the trial," which was conducted before the same judge as the sentencing hearing, so the state district court was aware of the information. (*Id.* at 12, 21.) And counsel testified that she thought the submission of letters was more effective than presenting testimony because Toribio-Ruiz's family was angry and "you can control the information that gets in front of a judge by using a letter as opposed to putting witnesses on the stand." (*Id.* at 28.) Finally, regarding the change to Nevada's lewdness law, counsel testified that she was aware of the change; however, she "was more concerned about whether [the lewdness conviction] r[a]n concurrent or consecutive" to the sexual assault conviction. (*Id.* at 11, 26-27.)

Toribio-Ruiz testified at the post-conviction evidentiary hearing that counsel never told him he could present witnesses at his sentencing, never told him that he could testify at the sentencing hearing, and never told him about the terms of the sentencing options. (ECF No. 21-6 at 36-37.) And regarding character witnesses at his sentencing, Toribio-Ruiz would have had the following people testify: "my nephews and nieces, my brothers and sisters, friends and my boss at Circus Circus and many of the other coworkers that worked with me." (*Id.* at 38.)

Following the post-conviction evidentiary hearing, the state district court found Toribio-Ruiz's counsel's "testimony very credible and that the defendant's testimony . . . not as credible." (ECF No. 21-7 at 4.) The state district court also was "not persuaded by any of the witnesses called that had they been called at the trial or at the sentencing a different result would have occurred." (*Id.*)

### 3.    Standard for effective assistance of counsel

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to

demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104-05. In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### 4.    State Court Determination

In affirming the state district court's denial of Toribio-Ruiz's state post-conviction petition, the Nevada Supreme Court held:

23

On appeal from the denial of his January 7, 2008, post-conviction petition for a writ of habeas corpus, appellant argues that the district court erred in denying his claim of ineffective assistance of trial counsel at sentencing. To prove ineffective assistance of counsel, a petitioner must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*). Both components of the inquiry must be shown, *Strickland*, 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

Appellant argues that his trial counsel was ineffective for failing to present sufficient arguments and mitigating evidence at sentencing. Appellant fails to demonstrate his trial counsel's performance was deficient or that he was prejudiced. Trial counsel testified at the evidentiary hearing that she did speak with appellant after the jury verdict and had discussed sentencing and character evidence as part of her trial preparation. Trial counsel presented six letters in mitigation for consideration at the sentencing hearing. Trial counsel explained at the evidentiary hearing that she did not present witnesses at the sentencing hearing because she had previously presented evidence of appellant's good character at trial and that sentencing was before the same judge that had presided over the trial. Trial counsel further testified that she was aware of the change in possible sentences regarding the lewdness count but that her strategy was to argue for concurrent sentences and emphasize appellant's lack of significant criminal history and to present his character through the letters and prior testimony at trial. Appellant fails to demonstrate that there was a reasonable probability of a different outcome had trial counsel presented further argument and mitigating evidence at sentencing.

(ECF No. 21-28 at 2–3.)

### 5.    Analysis

When challenging counsel's actions in failing to present mitigating evidence during a sentencing hearing, the "principal concern . . . is not whether counsel should have presented a mitigation case[, but instead] . . . whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*." *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) (emphasis in original). As the Nevada Supreme Court reasonably noted, Toribio-Ruiz's counsel testified that she presented character evidence in the form of letters instead of testimony because she had already

24

1    presented some character evidence before the same judge at trial[10] and because she

2    could control what was presented by introducing letters.

3          This decision not to introduce character evidence via testimony at the sentencing

4    hearing was reasonable. *See Richter*, 562 U.S. at 106 ("Rare are the situations in which

5    the wide latitude counsel must have in making tactical decisions will be limited to any

6    one technique or approach."); *see also Strickland*, 466 U.S. at 688-89 ("No particular set

7    of detailed rules for counsel's conduct can satisfactorily take account of the variety of

8    circumstances faced by defense counsel or the range of legitimate decisions regarding

9    how best to represent a criminal defendant.") And because the state district court

10   determined during post-conviction proceedings that it would not have sentenced Toribio-

11   Ruiz differently if counsel had called character witnesses at the sentencing hearing, the

12   Nevada Supreme Court reasonably determined that Toribio-Ruiz fails to demonstrate

13   prejudice. *See United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) (denying an

14   ineffective assistance of counsel claim based on counsel's refusal to call witnesses

15   because the defendant "offers no indication of . . . how their testimony might have

16   changed the outcome of the hearing").

17         Turning next to the argument that counsel failed to consult with him about the

18   sentencing hearing, Toribio-Ruiz's allegation is belied by the record. As the Nevada

19   Supreme Court reasonably determined, counsel, whom the state district court found

20   credible at the post-conviction hearing, testified that she spoke with Toribio-Ruiz about

21   sentencing during the course of her representation of Toribio-Ruiz and following the jury

22   verdict. This Court will not supplant that credibility determination. *See Rice v. Collins*,

23   546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree

24

25         [10]Toribio-Ruiz argues that this conclusion was based on an unreasonable
     determination of the facts because his witnesses at trial focused on his legal defense to
     sexual assault and lewdness, not on his good character. (ECF No. 86 at 38-39.) This
26   Court disagrees. Anna Maria Toribio-Ruiz, Teresa Toribio De-Saldana, Tiana Toribio,
     and Lila Blackstar, who were Toribio-Ruiz's sisters, daughter, and ex-wife, respectively,
27   testified at his trial. (*See* ECF No. 17-3 at 58, 63, 66, 69.) These witnesses testified, *inter
     alia*, that Toribio-Ruiz was generous, "[a] very beautiful person," had very good
28   relationships with children, was respectful, and was a loving father. (*Id.* at 60, 64, 73, 74.)
     Thus, these witnesses testified about his good character in addition to his legal defense.

1  about the [witness]'s credibility, but on habeas review that does not suffice to supersede

2  the trial court's credibility determination.").

3     And turning finally to the argument that counsel's brief argument at the

4  sentencing hearing was deficient, Toribio-Ruiz fails to articulate what arguments counsel

5  should have made regarding his life, characteristics, and whether he deserved the

6  minimum sentence. *See Strickland*, 466 U.S. at 690 (recognizing that a petitioner "must

7  identify the acts or omissions of counsel that are alleged not to have been the result of

8  reasonable professional judgment"); *Laboa v. Calderon,* 224 F.3d 972, 981 (9th Cir.

9  2000) (holding petitioner has the burden of proof under the *Strickland* test). And

10  regarding counsel's alleged failure to cite the change in Nevada law and argue that the

11  prosecutor's amendment to the charge was an underhanded tactic to restrict his

12  sentencing options, the Nevada Supreme Court reasonably noted that counsel testified

13  that her strategy was to argue for concurrent sentences. Indeed, because Toribio-Ruiz's

14  sexual assault conviction was non-probational, *see* NRS § 176A.100(1)(a), arguing for

15  Toribio-Ruiz's lewdness conviction to run concurrent to the sexual assault conviction

16  was a reasonable strategic decision. *See Strickland*, 466 U.S. at 690 ("[S]trategic

17  choices made after thorough investigation of law and facts relevant to plausible options

18  are virtually unchallengeable.").

19     Therefore, the Nevada Supreme Court's determination that Toribio-Ruiz failed to

20  demonstrate that counsel's performance was deficient and resulting prejudice

21  constitutes an objectively reasonable application of *Strickland*'s performance and

22  prejudice prongs. 466 U.S. at 688, 694. Toribio-Ruiz is not entitled to federal habeas

23  relief for ground 4(a).[11]

24

---

25  [11]Toribio-Ruiz requests that this Court conduct an evidentiary hearing. (ECF No.
31 at 39.) Toribio-Ruiz fails to explain what evidence would be presented at an evidentiary
26  hearing, especially since a thorough evidentiary hearing was held by the state post-
conviction court. Further, neither further factual development nor any evidence that may
27  be proffered at an evidentiary hearing would entitle Toribio-Ruiz to relief. *Schriro v.
Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary
28  hearing, a federal court must consider whether such a hearing could enable an applicant
to prove the petition's factual allegations, which, it true, would entitle the applicant to
federal habeas relief."). Toribio-Ruiz's request is denied.

1    **V.    CERTIFICATE OF APPEALABILITY**

2          This is a final order adverse to Toribio-Ruiz. Rule 11 of the Rules Governing

3    Section 2254 Cases requires this Court to issue or deny a certificate of appealability

4    (COA). As such, this Court has *sua sponte* evaluated the claims within the petition for

5    suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281

6    F.3d 851, 864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue

7    only when the petitioner "has made a substantial showing of the denial of a constitutional

8    right." With respect to claims rejected on the merits, a petitioner "must demonstrate that

9    reasonable jurists would find the district court's assessment of the constitutional claims

10   debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v.

11   Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if

12   reasonable jurists could debate (1) whether the petition states a valid claim of the denial

13   of a constitutional right and (2) whether this Court's procedural ruling was correct. *Id.*

14         Applying these standards, this Court finds that a certificate of appealability is

15   unwarranted.

16   **VI.    CONCLUSION**

17         It is therefore ordered that the second amended petition for a writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254 (ECF No. 31) is denied.

19         It is further ordered that a certificate of appealability is denied.

20         The Clerk of Court is directed to substitute Tim Garrett for respondent Isidro Baca,

21   enter judgment accordingly, and close this case.

22         DATED 3rd Day of March 2022.

23

24

25   _____
     MIRANDA M. DU

26   CHIEF UNITED STATES DISTRICT JUDGE

27

28

27